1:20 MJ 9023

**AFFIDAVIT**

I, Paul Cruz, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, being duly sworn on oath, hereby deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Cleveland Division. I have been so employed since 2010 and as such have been assigned to investigate organized criminal enterprises engaged in a variety of racketeering offenses to include drug trafficking, money laundering, document fraud, theft, drug violations, and other criminal offenses which have occurred in, and outside, the Northern District of Ohio. I have training and experience in interviewing and interrogation techniques, arrests, search and seizure, search warrant applications, and various other procedures. In the course of conducting investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and executing search warrants. As such, I am an law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is , and officer of the United States empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. Prior to joining the FBI, I was employed for seven years as a United States Marine Corps officer. In that capacity I was assigned to work investigations involving fraudulent enlistments, fraud against the government, adultery, vehicle accidents, Congressional inquiries, litigation claims, and other crimes under the Uniform Code of Military Justice.

2. The statements contained in this affidavit are based on my personal observations as well as information developed by other Special Agents ("SA") of the FBI, Ohio Bureau of

Criminal Investigations ("BCI"), and officers and detectives of state, local, and federal police departments in Ohio who aided in the investigation.  Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or an investigator (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, any information pertaining to vehicles and registrations, personal data on subjects, and record checks, has been obtained through the Law Enforcement Automated Data System ("LEADS"), various state driver's license motor vehicle records, online database searches or the National Crime Information Center ("NCIC") computers, and various open source databases such as LexisNexis.

   3. Your Affiant has participated in and conducted investigations into activities involving narcotics and other illicit, not-narcotic controlled substances. Your Affiant is familiar with the methods with which drug traffickers conduct their businesses, including, but not limited to, their methods of importing, and distributing controlled substances, their use of cellular telephones, computers and other electronic devices, their use of businesses, houses, multiple vehicles and other facilities in which controlled substances are stored and meetings are conducted, and their use of numeric codes and code words to conduct their narcotics transactions. Affiant is also familiar with drug traffickers' use of communication devices, and texting applications and programs on such devices to conduct their businesses, including, but not limited to, transmitting information regarding price, quantity, and transportation of controlled substances.

   4. Your Affiant is aware persons involved in criminal activity, particularly in the distribution of controlled substances, frequently attempt to conceal their identities, the locations

at which the illicit transactions occur, and the laundering of proceeds from the illicit activity to "plain" currency.

5.  Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that DEVON KEHOE and others have violated 21 U.S.C § 841(a)(1) and (b)(1)(C) (distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same) (hereinafter referred to as the "Target Offenses").

## RELIABILITY OF CONFIDENTIAL SOURCE INFORMATION

6.  During the course of this investigation, law enforcement agents and officers have received information from a confidential source regarding members of the DTO. Some of the information from this confidential source has been outlined in this affidavit. Information provided by the confidential source has been corroborated to the extent practicable through investigative techniques including, but not limited to, physical surveillance, review of telephone toll records and pen register data, recorded telephone calls, conversations with other law enforcement officers, review of investigative reports and debriefings of other confidential sources. The confidential source listed in this affidavit has provided information pertaining to the drug trafficking activities of the members of the DTO including KEHOE and PERSTIN.

### CS-1

7.  CS-1 has provided information to Cleveland Heights Police Department, and the FBI since March of 2019. CS-1 is providing information in the hopes of getting consideration at sentencing for pending drug charges of possession and distribution of controlled substances. CS-1 has significant criminal history including numerous drug charges. CS-1 has provided information leading to the execution of approximately 8 local search warrants with multiple drug and cash seizures. The information provided by CS-1 has proved reliable through independent

verification. Your Affiant does not have any reason to believe the information provided by CS-1 was false, therefor, your Affiant believes that CS-1 is reliable.

## PROBABLE CAUSE

8.      On September 5, 2019, at approximately 1842 hours, physical surveillance was conducted at a known residence at 10507 Lake Road, Cleveland, Ohio (henceforth Target Location 2) and on the stash house at 2676 Overlook Road, Cleveland Heights, Ohio (henceforth Target Location 1).  The surveillance was initiated due to the nature of intercepted communications (pursuant to an authorized TIII) KEHOE and a Known Male (KM). KEHOE and KM agreed to meet at a known residence for a suspected drug transaction. KEHOE travelled from Target Location 1 directly to the known residence without making a stop.  While KEHOE was driving, KEHOE employed a number of counter surveillance tactics.  Specifically, he was stopping in the roadway to check stationary cars for occupants, routinely turning in his seat to spot vehicles, and consistently driving between five to ten miles per hour below the posted speed limit; all common efforts routinely seen by experienced drug traffickers to identify law enforcement surveillance.  At approximately 19:57 hours, KEHOE and PERSTIN arrived at the known residence and exited the identified Mercedes C-300, license plate HPF9910, and were met by KM in the driveway.   KEHOE was observed removing a large black book bag from the trunk of the vehicle and slinging the bag around his shoulders.  KEHOE then removed a large black duffel bag from the trunk and closed the trunk lid.  KEHOE then walked to meet KM at the sidewalk in front of the home where KM,   KEHOE, and PERSTIN entered the residence.

9.      At approximately 20:20 hours, KEHOE and PERSTIN exited the known residence no longer carrying the (2) bags that they carried inside the residence. KEHOE entered

4

the Mercedes and immediately left the area. The Mercedes then traveled to the Little Italy area of Cleveland, where surveillance was ultimately terminated.

10. On September 12, 2019, Magistrate Judge Jonathan D. Greenberg, Northern District of Ohio, authorized the installation of a GPS device on the black Mercedes driven by KEHOE.

11. On November 14, 2019, KM met with KEHOE. Physical surveillance was conducted during the meeting and the conversation between KM and KEHOE was monitored for audio and video. During the conversation, KEHOE stated that he had a large amount of THC for sale. KEHOE then invited KM to travel with KEHOE to Portland, Oregon, to pick out marijuana plants which would be placed on a truck and shipped to Ohio or Michigan. KEHOE stated that the minimal amount of plants that KM would have to purchase for 500 plants for $200 per plant. KEHOE and KM made agreements for KM to receive a THC sample from KEHOE in the following weeks. KEHOE returned to Target Location 2 after the meeting.

12. On November 29, 2019, KM met with KEHOE again. Physical surveillance was conducted during the meeting and the conversation between KM and KEHOE was monitored for audio and video. KEHOE left Target Location 1 and arrived at the meeting location driving a blue Mercedes, license plate FNP3732. GPS on the black Mercedes confirmed that the black Mercedes was in the shop for repairs. The blue Mercedes was registered to a local Mercedes dealership. During the conversation, KEHOE provided KM with approximately 200 grams of THC, and approximately 5 grams of cocaine. Law enforcement officers (LEO) seized the suspected cocaine, which was field tested via Nik and tested positive for cocaine. LEO also seized the THC, which was sent to BCI's lab and later tested positive for THC. It is believed

5

that KEHOE provided the THC and cocaine as a sample in order for KM to make larger purchases of both drugs in the future. KEHOE returned to Target Location 1 after the meeting.

13. On December 16, 2019, surveillance units observed PERSTIN leaving Target Location 2 in the black Mercedes. Approximately five minutes later KEHOE was observed leaving Target Location 2 and driving his 2010 Honda Civic. Prior to KEHOE's departure, KEHOE was observed loading a green suitcase into the trunk of his vehicle. It is known to investigators that KEHOE often carries large quantities of narcotics with him in luggage type bags. KEHOE left and travelled to the area of West 29th & Clinton Avenue, where PERSTIN was waiting for him at a coffee shop. Both travelled in separate vehicles from Target Location 2 and arrived at the same location at the coffee shop. While driving to this location KEHOE drove well under the posted speed limit, a technique known to Affiant to be used by those involved in criminal activity as a means to counter law enforcement surveillance efforts, and a technique that has previously been employed by KEHOE while transporting drugs on September 5, 2019. Both are observed walking away from their respective vehicles before turning around and heading back towards the vehicles after 5 minutes. Because of the congested area, KEHOE was not observed the entire time and it is unknown if KEHOE met with another person.

14. In my experience, drug transaction sometimes occur where a vehicle is left unattended in a parking lot with the truck left open. The buyer then retrieves the drugs from the seller's truck. This practice is used to avoid hand to hand transactions and thus law enforcement detection.

15. When departing the coffee shop PERSTIN was again observed leaving the black Mercedes several minutes before KEHOE did in his Civic. KEHOE and PERSTIN each travelled to Cleveland Heights where they ultimately arrived at Target Location 1 and parked

6

deep in the driveway away from plain view. Investigators suspect that PERSTIN leaving just a couple minutes ahead of KEHOE and stopping at the same locations was a form of counter surveillance utilized by KEHOE and PERSTIN; both appear to be very surveillance conscience. During the surveillance operation on December 16th, 2019, KEHOE was not observed traveling to any locations in which a person would typically take luggage.

16. On or about December 19, 2019, Magistrate Judge William H. Baughman, Jr., Northern District of Ohio, authorized the installation of a GPS device on the Honda Civic driven by KEHOE.

17. On December 20, 2019, KM again met with KEHOE. Physical surveillance was conducted during the meeting and the conversation between KM and KEHOE was monitored for audio and video. KEHOE and PERSTIN left Target Location 2 and travelled to Target Location 1, stopping for a short time, before meeting with KM. KEHOE arrived in the meeting spot in the black Mercedes with PERSTIN as the driver. KM exchanged approximately $6,000 for a liter of THC from KEHOE inside the vehicle while PERSTIN remaining in the driver's seat and watched the exchange. During the transaction the recording device failed and did not capture the entire transaction, however, physical surveillance confirmed the transaction occurred in the vehicle. During the transaction, KM stated that KM wanted to introduce someone to KEHOE in order for KEHOE to sell the person kilograms of cocaine and THC. After the meeting, KEHOE and PERSTIN returned to Target Location 2. The THC was later tested at BCI laboratory and tested positive for THC. The total weight of the THC purchased from KEHOE was approximately 993 grams.

18. On January 6, 2020, the Cleveland Heights Police Department was called for a health and welfare check on KEHOE at the Overlook address. Cleveland Heights Police

Department and Fire Department arrived to the Overlook address to be greeted by KEHOE's father. KEHOE's father explained that KEHOE had taken prescription medication and cocaine and was suicidal and in the possession of a firearm. KEHOE's father did not allow police or fire department personnel into the residence. KEHOE came to the door and was transported to Lutheran Hospital for evaluation and was then released on his own accord.

19. On January 13, 2019, KM exchanged a series of text messages with KEHOE in which KM stated that he wanted to introduce someone to KEHOE on January 17, 2019. KM stated to KEHOE that KM would take 10% of any sales that KEHOE did with the person KM introduced. KEHOE agreed to meet with KM and be introduced. The FBI were able to arrange it that the person KM introduced is an undercover (UC) Special Agent with the FBI.

20. On January 17, 2020, KEHOE departed from Target Location 2 and was dropped off at a business in Bedford, Ohio; the vehicle dropping KEHOE off appeared to be a ridesharing vehicle service.

21. On January 17, 2020, KM introduced FBI Undercover Special Agent UC#8065, to KEHOE. During their recorded conversation, KEHOE and UC#8065 discussed the sales of cocaine. KEHOE also explained that he used to have a steady supply of drugs and was making a lot of money until suddenly his supply line dried up. KEHOE also explained that the price for importing cocaine from California has been heavily taxed because of the transportation costs. UC#8065 discussed the price of cocaine for $37,000 per kilogram and KEHOE told UC#8065 that he would consider selling UC#8065 cocaine for that price. KEHOE inquired of UC#8065 as to quantities of cocaine UC#8065 was selling in New Jersey. KEHOE specifically asked if UC#8065 was selling "quarter chickens" per deal. In the affiant's experience, "quarter chicken" is code for quarter kilograms of cocaine. UC#8065 and KEHOE exchanged phone numbers and

agreed to be in touch within the week to discuss future drug deals. KEHOE advised UC#8065 that KEHOE "never talks on the phone" and asked UC#8065 to download an end to end encrypted chat application. In affiant's experience, drug dealers do not like to speak on cell phones in order to avoid law enforcement detection but rather use applications such as "Signal" to conduct drug transactions. KEHOE further explained that he was dropping his current phone number at the end of the week. In my experience, drug dealers often change phone numbers to avoid law enforcement detection.

22. On January 20, 2020, KEHOE texted UC#8065 asking if UC#8065 could meet KEHOE in New Jersey to further discuss the sale of kilograms of cocaine. UC#8065 agreed to meet with KEHOE but did not specify a time or place. During the days to follow, UC#8065 texted KEHOE but did not receive any responses.

23. On January 21, KEHOE met with CS-1 and asked CS-1 if CS-1 was interested in purchasing bulk ecstasy pills. CS-1 declined the offer. KEHOE then further explained that KEHOE was heading to California to "re-up" his drug supply. KEHOE stated that when KEHOE returned he would get in contact with CS-1.

24. From January 21, 2020, to February 9, 2020, KM, CS-1, and UC#8065 attempted to contact KEHOE via text message. KEHOE did not reply to any of the messages. It is believed that KEHOE turned his current phone off in order to avoid law enforcement detection.

25. In the evening of February 9, 2020, KEHOE contacted CS-1 and asked to meet. CS-1 agreed to meet KEHOE on February 10, 2020.

26. On February 10, 2020, KEHOE met with CS-1 in Cleveland Heights, Ohio. The meeting was consensually recorded. KEHOE stated to CS-1 that he just returned from California to resupply KEHOE's drug stash. KEHOE and CS-1 agreed to make a deal for 3.5 ounces of

9

cocaine, 2 ounces of ecstasy, and 100 pills of prescription Xanax for approximately $2,500. During the conversation, KEHOE stated that he had kilogram amounts of cocaine but was holding onto it for another customer. KEHOE stated to CS-1 that the cocaine customer could call at any time to purchase the kilogram and therefore could not sell CS-1 more than 3.5 of cocaine as a sample.

27. On February 11, 2020, KEHOE and CS-1 met in Cleveland Heights, Ohio. KEHOE received $2,200 and gave CS-1 5.4 grams of cocaine, and 58.2 grams of ecstasy. Prior to the meeting, KEHOE left Target Location 2 and travelled directly to Target Location 1. KEHOE stopped at Target Location 1 for approximately 3 hours and departed directly Target Location 1 to meeting with CS-1. It is believed that KEHOE was stopping at to retrieve his stash of drugs at Target Location 1. During the drug transaction, CS-1 asked KEHOE if KEHOE had at least 9 more ounces of cocaine for sale for later in the week. KEHOE stated that he did and would arrange a deal for the 9 ounces of cocaine later in the week. After the drug transaction, KEHOE returned to Target Location 1 before departing to Target Location 2. It is believed that KEHOE returned to Target Location 2 with the proceeds from the drug transaction.

28. Once law enforcement met back with CS-1 after the drug transaction with KEHOE, the drugs were field tested and resulted in positive drug indications.

## CONCLUSION

29. Throughout the investigation, physical surveillance, consensually monitored recordings, and GPS data has confirmed that KEHOE travels to the Lake address from the Overlook address to retrieve drugs before making drug transactions. Additionally, on at least one occasion, KEHOE and PERSTIN have travelled from the Target Location 2 to Target Location 1, in separate vehicles, and arrived at the same destination while conducting counter surveillance.

During this event, KEHOE was seen carrying a large green suitcase but did not travel to any place that would require such an item.  It is believed that KEHOE and PERSTIN are residing at the Target Location 2 and using Target Location 1 as a stash house for their drugs. Additionally, the pattern KEHOE uses to make drug transactions shows that KEHOE use the Target Location 1 as a stash house for drugs and the Target Location 2 as a stash house for money, electronic devices, or documents pertaining to the DTO.

30. Based upon my training and experience, including my participation in this investigation, I believe that probable cause exists that DEVON KEHOE has distributed and possessed with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and has conspired with PERSTIN and others to do the same, in violation of 21 U.S.C. § 846.

_____
Paul R. Cruz
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission
by reliable electronic means.
Fed. R. Crim. P.3, 4(d) and 4.1,
on this __12th__ day of February, 2020.

_____                     Time: __3:00pm__
WILLIAM H. BAUGHMAN, JR.
UNITED STATES MAGISTRATE JUDGE

11